UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER FOR ENTRY OF JUDGMENT

* * * * * * * * * * * * * * * * * * *

Inland Paperboard and
Packaging Inc.,

Plaintiff,

vs.

GFI America, Inc., and
Federal Beef Processors,
Inc.,

Defendants. Civ. No. 02-59 (RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 1st day of March, 2004.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by the provisions of Title 28 U.S.C. §636(c). The action arises from the claim of the Plaintiff Inland Paperboard and Packaging, Inc. ("Inland"), that the Defendants GFI America, Inc., and Federal Beef Processors, Inc. (collectively "GFI"), breached their contractual obligations, which resulted in damage

to Inland in the amount of One Hundred Twenty-one Thousand Nine Hundred and Twenty-Five Dollars ($121,925.00). GFI denies any breach of contract, and further denies that Inland sustained any damages.[1]

The Court Trial of this action commenced on December 2, 2003, and continued through December 3, 2003, when, after the presentation of oral summations, the matter was taken under advisement. Inland appeared by Timothy J. Pramas, Esq., and GFI appeared by Martin A. Carlson, and Charles N. Nauen, Esqs.

Based upon the entirety of the Record before us, the files, Exhibits, and argument of counsel, and being fully advised in the premises, we now make our Findings of Fact, and Conclusions of Law, as follows:

## II. Findings of Fact

1. Inland is a corporation under the laws of Delaware, which has its principal place of business at 4030 Vincennes Road, Indianapolis. Inland is in the business of manufacturing corrugated shipping containers to the specifications of its

---

[1]In its Complaint, Inland asserts claims under a “Corrugated Purchase Agreement,” and a “Promissory Note and Purchase Money Security Agreement.” See, Complaint [Docket No 1], at p. 3, ¶7, et seq. Those claims were not litigated at Trial, and therefore, we presume that they have either been amicably resolved, or abandoned, and we do not address them further.

customers. In manufacturing the containers, Inland must employ printing dies, which print logos, and identification names and marks, to the outer surfaces of the paper containers. In addition, Inland employs cutting dies so as to trim the sides, tops, and bottoms of the boxes, to conform to the appropriate dimensions. Given the unique needs of each of Inland's customers, the cutting and printing dies tend to be unique to those needs, so that they are not easily employed in the manufacture of corrugated boxes for other customers of Inland. As would be expected, the dies wear with use, and must be repaired, or replaced, depending upon the frequency of that use.

2. GFI is a Minnesota corporation, which has its principal place of business in Minneapolis, Minnesota, and which processes, and distributes, beef products to its customers in each of the fifty States. Federal Beef is a wholly-owned subsidiary of GFI, and exists in name only, after a fire, in January of 2000, destroyed the slaughterhouse facility that was associated with Federal Beef. The transactions at issue in this litigation transpired between representatives of GFI and Inland.

3. Steven T. Nerison ("Nerison") is currently the General Manager of Inland, a position he assumed in March of 2000. As General Manager, Nerison is in charge of all of Inland's

employees, departments, and operations. Prior to March of 2000, Nerison first worked for Inland in 1993, when he was employed as a Sales Representative in opening new accounts. Nerison remained in that position for two and one-half, to three years, at which time, he assumed employment with Willamette Industries as a Sales Manager. Nerison returned to Inland on February 12, 1998, as a Sales Manager, who was in charge of the company’s sales and design department. Nerison had some dealings with GFI after his return to Inland in February of 1998, and was the only witness called by Inland to testify in this matter.

4. Jacob (“Jay”) H. Goldberger (“Goldberger”) is currently the Senior Vice President of Purchasing at GFI. GFI is a family-owned business, and Goldberger is the third generation of his family to be involved in the operations of GFI. He was first employed by GFI as a Purchasing Coordinator, in 1992, and he worked his way up in the management of the company. At the time of Trial, he had been the Senior Vice President of Purchasing for about one year and, in that position, he oversees all of the company’s purchasing, including boxes, bags, meat, chemicals for cleanup, and the like. Goldberger was involved in all of the negotiations at issue in this case, and was the only employee of GFI who was called to testify.

5. Peter Gareri ("Gareri") currently serves as a consultant for Central Container, in Brooklyn Park, Minnesota. Gareri previously served as a Sales Manager for Inland, until he left that employment on February 1, 1998. In late 1996, or early 1997, Gareri first sold printed corrugated boxes to GFI, and his principal contact at GFI was Goldberger. As a Sales Manager, Gareri managed the sales force at Inland, as well as the dealings with Inland's customers. When Gareri left Inland's employment, in February of 1998, he was succeeded, as Inland's Sales Manager, by Nerison. Gareri testified at Trial, at the instance of GFI. No other witnesses, apart from Nerison, Goldberger, and Gareri, were called to testify.

6. The business relationship, between GFI and Inland, commenced in 1996, through an informal, non-written arrangement, that had been negotiated by Gareri and Goldberger. Under that arrangement, Inland would supply different boxes to GFI, which were designed for specific products of GFI, and which bore labels unique to GFI. Goldberger testified that GFI purchased twenty-five to thirty different types of boxes, and that everything that GFI sold was sold in boxes.

7. In manufacturing boxes, Inland would employ paper of different consistencies, which would be glued into cardboard,

cut with dies to certain specified shapes, and printed with labels that were embossed on the boxes by printing plates, also unique to GFI. Such dies, and plates, being unique to GFI, and being subject to wear, required maintenance, or replacement, from time to time. In order to fund the manufacture, repair, or replacement of the dies, Gareri and Goldberger agreed that GFI would pay a higher price for Inland's boxes, so as to recoup those costs, until a minimum number of boxes had been purchased. At that point, a reduced price would be charged, by Inland, for the boxes and, since the dies and plates were unique to GFI, Gareri and Goldberger agreed that GFI would then assume ownership over the dies and plates.

8. In 1997, the arrangement between GFI, and Inland, was first reduced to a written agreement (the "1997 Agreement"). See, GFI Exhibit 40. Unfortunately, the terms of that agreement are both cryptic, and correspondingly vague. Indeed, the contract has two renditions of the first page, and neither party to the contract is able to identify which of the first pages formed a part of the parties' agreement. The parties' dispute centers, in large part, upon the contractual provisions relating to a "Volume Discount," and "Printing and Cutting Dies."

Paragraph 3 of the 1997 Agreement addresses the "Volume Discount" as follows:

> A. At the end of the agreement Inland Corporate will issue a 3% discount on paid invoices of (1) million dollars or more.
>
> B. No volume discount will be issued if this condition is not met.

[Emphasis in original].

Inland maintains that the phrase "end of the agreement" is defined by the "Length of the Agreement" provision, which the contract identifies as extending from "July 1, 1997 through June 30, 1998." Id. at ¶1(A). GFI, on the other hand, contends that the "end of the agreement" language is informed by the contract's provision on "Credit," which states that: "Established terms are 1% - 10, Net 30 and must be adhered to or they will revert to net 30 days." Id. at ¶6(A). As explained by Goldberger, if GFI paid an invoice within 10 days, then GFI could take a discount on that invoice of 1%, whereas, if GFI did not pay the invoice price within 10 days, then the net amount of the invoice was due within 30 days. Although he could not recall the details of the negotiations, which led to the 1997 Agreement, Gerari testified that the volume discount approach had been employed, by Inland, with other customers.

9. Paragraph 5 of the contract, which pertains to "Printing and Cutting Dies," provides as follows:

> A. Inland will purchase all dies, but will ask for partial or full payment by item on those which Inland does not receive enough volume to recover die costs (i.e. - die recovery form).
>
> B. G.F.I. to be responsible for any changes to current specifications of printing or cutting dies.

As noted, the Record reveals that certain of the referenced die recovery forms predated the contract by being dated in 1996. See, GFI Exhibit 41.

10. According to the Record presented, the relationship of the parties, as governed by the 1997 Agreement, was amicable and without incident. In June of 1998, the parties negotiated a successor agreement (the "1998 Agreement"), which would extend from "July 1, 1998 through June 30, 1999." Inland Exhibit 2. As pertinent to the "Volume Discount," the 1998 Agreement introduced no substantive changes.[2]

---

[2]The 1998 Agreement addressed the Volume Discount, as follows:

> A. At end of agreement Inland corporate will issue a 3% volume discount on paid invoices $1,000,000 or more.

(continued...)

11. With respect to the "Credit" provision, the 1998 Agreement provided as follows: "Net 60 day terms, but must be adhered to or they will revert to Net 30 days." Id. at p. 1, ¶3(A). According to the uncontradicted testimony of Goldberger, he had attended an industry meeting, and came to the realization that others were obtaining 60-day credit terms, and Goldberger advised Inland that GFI wanted the same. As noted, Inland agreed but, if GFI did not pay within the 60 days, then the provision would revert to "Net 30 days." Lastly, as to "Printing/Cutting Dies," the 1998 Agreement provided as follows:

> A. Inland to purchase and own all tooling used during contract period.
>
> B. Inland will ask for partial or full payment by item on those which Inland does not receive enough volume to recover costs, i.e., die recovery form.
>
> C. G.F.I. America/Federal Beef is responsible for all unrecovered tooling costs on obsolete items, also for any changes to current specifications of tooling.

Id. at p. 1, ¶4(A)-(c).

---

[2](...continued)

> B. No volume discount will be issued if conditions are not met.

Inland Exhibit 2, at p. 2, ¶5.

Notably, unlike the 1997 Agreement, the 1998 Agreement expressly referenced who would "own all tooling used during contract period." The 1997 Agreement was silent as to the ownership of "tooling."

12. Following the termination of the 1997 Agreement, Inland computed the Volume Discount, to which GFI would be entitled, and by check dated August 26, 1998, Inland paid GFI $35,595.00, as the "yearly rebate" under the 1997 Agreement. GFI Exhibit 42, at p. 2. The amount of the rebate was calculated as three percent of "total sales dollars of $1,186,500.00." Id. at p. 1. The Inland Check Request form, seeking an Inland check in the amount of $35,595.00, was prepared by Julie Loftus ("Loftus") who, apparently, was in the accounting department of Inland, and was approved by Dan Blakley ("Blakley"), the then General Manager of Inland. Plainly, the Volume Discount, under the 1997 Agreement, was predicated on "total sales," and not on actually "paid invoices" as of June 30, 1998. According to the unrebutted testimony of Goldberger, the "total sales," upon which Inland paid the Volume Discount, included invoices which GFI

paid after June 30, 1998, and GFI paid all such invoices within 30 days after June 30, 1998.[3]

13. GFI maintains that the payment of a Volume Discount, under the 1997 Agreement, constitutes a "course of dealing" which confirms the parties' intent in adopting a Volume Discount. See, Minnesota Statutes Section 336.1-205.[4] In

---

[3]We have attempted to independently corroborate Goldberger's testimony, on the basis of the Exhibits of Record. We have been unable to do so, See, GFI Exhibits 43 and 44, but Inland did not challenge that testimony, and rested on its own representation that the Volume Discount, under the 1997 Agreement, was an "error" on Inland's part. The referenced Exhibit 44 is largely inscrutable, and was not sufficiently explained in the testimony, except to the extent that we can discern the payment, by GFI, of invoices dated at the end of June of 1998, before the end of August. GFI Exhibit 43, at p. INL00759. While GFI underscored that fact in its questioning of Nerison, the point is inconsistent with GFI's contention that the "end of agreement," as provided in the 1997 Agreement, extended to the end of the credit period allowed, as the 1997 Agreement only allowed 30 days net, and not 60 days net. Nonetheless, Goldberger's testimony, that GFI paid all of the invoices within 30 days of June 30, 1998, stands unrebutted. As for Exhibit 43, it plainly relates to "total sales," without reference to when the payments on those sales were made.

[4]In relevant part, Section 336.1-205 provides as follows:

> (1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(continued...)

addition, Goldberger was emphatic, in his testimony, that the parties intended to include, in the computation of total sales for Volume Discount purposes, invoices before the deadline of June 30, 1998, which were paid during the allowed period of credit. As further indicia of that "course of dealing," GFI offers a series of letters, authored by Peter Javorina ("Javorina"), who was a Sales Representative with Inland, which detailed, for Goldberger's review, the "actual sales, not paid invoices," under the 1998 Agreement. Although Inland emphasizes the distinction, between "actual sales" as opposed to "paid invoices," Goldberger testified, without contradiction, that the

---

[4](...continued)

* * *

> (3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware given particular meaning to and supplement or qualify terms of an agreement.
>
> (4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade. * * *.

<u>Minnesota Statutes Section 336.1-205(1), (3) and (4)</u>.

letters would serve no other purpose than to alert him to GFI's potential entitlement, to a Volume Discount, based upon total sales. See, GFI Exhibit 50; Inland Exhibit 3.

14. For its part, Inland contends that the Volume Discount, which Inland paid to GFI under the 1997 Agreement, was an internal error committed by Loftus. As we have noted, however, the Record reveals that Blakley approved the payment, and signed Inland's Check Request form. Nerison, who succeeded Blakley, testified that neither he, nor to his knowledge, anyone at Inland, notified GFI that an error had been committed in allowing the Volume Discount. The Record does not reveal when Inland discovered the error, nor is there any indication, in this Record, that Inland had subsequently sought to recover the erroneous payment, or justified its subsequent refusal to pay a Volume Discount, under the 1998 Agreement, by explaining that the earlier payment had been the product of error.

15. The Volume Discount, under the 1997 Agreement, was paid after the parties had executed the 1998 Agreement. The Record does not reflect whether either party questioned the substantive meaning of the Volume Discount provision, which was contained in the 1998 Agreement, or had reason to do so. As had previously been the case under the 1997 Agreement, the parties appear to

have proceeded amicably in their business relationship under the 1998 Agreement.

16. At the end of the 1998 Agreement, the parties commenced negotiating a new agreement (the "1999 Agreement"). See, Inland Exhibit 14. Both parties agree that the negotiation of the 1999 Agreement was more extensive than had been the case for either of the two preceding agreements. The negotiations consumed approximately two months, which was largely attributable to rising prices in the paper commodities market. The walls of corrugated boxes are composed of two outer layers of liner paper, which are cemented together by a wavy layer of medium paper. The price of medium paper was fluctuating, and was becoming more expensive, and that threatened the profitability of Inland's boxes. As a consequence, the 1999 Agreement was executed in September of 1999, but its contract period extended from "July 1, 1999 though June 30, 2000." Id. at p. 1, ¶1.

17. The provisions of the 1999 Agreement, which related to the "Volume Discount/Rebate," were substantively identical to the earlier Agreements, in that they provided as follows:

- At end of agreement Inland Paperboard and Packaging will issue G.F.I. America/Federal Beef a 3% discount on paid invoices of $1 million or more.

- No discount will be issued if conditions are not met.

Id. at p. 1, ¶3.

According to the Record before us, there was no discussion concerning the meaning of the Volume Discount/Rebate language. Inland was less than forthright in its negotiation of the 1999 Agreement. Although unknown to GFI, the management of Inland, inclusive of Blakley, Nerison, Javorina, and Loftus, had concluded, by no later than July 26, 1999, that, under Inland's ostensible interpretation of the 1998 Agreement, GFI was not entitled to a Volume Discount for 1999. During Inland's contractual negotiations with GFI, Inland never informed GFI that it would not be paying a Volume Discount for 1998.

18. Nevertheless, in an internal Inland memorandum dated July 26, 1999, from Loftus to Blakley, Nerison, and Javorina, Loftus advised that "Total Sales through June 30, 1999" were "$1,113,803.07," but "Open Receivables [on] July 1, 1999" were "[$]241,670.03," thereby resulting in "Total adjusted sales" of "$872,133.04." GFI Exhibit 47; Inland Exhibit 15. Loftus concluded her memorandum by stating:

> According to the contract there would be no 3% volume discount due to customer. Please see me if you have questions or if this is not in agreement with everyone.

Id.

Notwithstanding the fact that Inland had paid a Volume Discount, in 1997, under effectively identical contractual language, and on a slightly greater amount of total sales, Inland elected not to disclose, for reasons neither explained in this Record, nor apparent, its newly adopted construction of the Volume Discount language, even though, during that same period of time, Inland was negotiating a new contract with GFI, which substantively employed the very same language. In fact, Goldberger testified that he had not seen Loftus' memorandum until litigation ensued between the parties, and that the document was not then disclosed, except through discovery. Goldberger also testified that GFI would not have negotiated a further contract with Inland if the memorandum would have been contemporaneously disclosed.

19. With respect to the credit provisions of the 1999 Agreement, they are not meaningfully different from those contained in the 1998 Agreement. Inland Exhibit 14, at p. 1, ¶2 ("Net 60 days," and "[i]f terms are not adhered to they will change to net 30 days."). As to the "Tooling" provisions, they were as follows:

- Inland Purchasing and Packaging to purchase and own all tooling used during agreement period.

- G.F.I. America/Federal Beef is responsible for unrecovered tooling costs on obsolete items or changes to current specifications.

- G.F.I. America/Federal Beef will reimburse Inland Paperboard and Packaging within 30 days of the end of this agreement for all tooling charges which are not recovered per our tooling recovery forms that will be provided by Inland to GFI/Fed Beef.

Id. at p. 2, ¶5.

The 1999 Agreement was the last such agreement between the parties.

20. The business relationship between the parties soured in 1999, after the execution of the 1999 Agreement. According to Goldberger, in September of 1999, he had inquired first of Javorina, and then of Nerison, as to the Volume Discount under the 1998 Agreement. Goldberger testified that, sometime after September 1, 1999, Javorina and Nerison told him that GFI was entitled to the "rebate," but that there were "issues" in getting "corporate" to issue the check, as "it wasn't as easy as it used to be." When delay in receiving the Volume Discount continued, Goldberger informed Javorina and Nerison that he was going to take the rebate and that he would advise them on which invoices he would do so. As recounted by Goldberger, they responded that he "should do what you have to do." Goldberger

testified that he understood he was auth-orized to take the Volume Discount by Nerison, although Nerison had testified to the contrary. On October 29, 1999, GFI took a Volume Discount of $38,336.10, and noted that fact on an invoice which accompanied GFI's payment to Inland of amounts over and above the rebate. GFI Exhibit 54; Inland Exhibit 9.

21. Subsequently, at the end of November, or in early December, Inland salesmen informed Goldberger that Inland had an issue with the Volume Discount claimed by GFI. Leading up to that same time, GFI was experiencing greater delays in the receipt of the boxes that Inland had been producing which, as related by Goldberger, were being attributed to labor issues that Inland was confronting. Goldberger testified that, in October of 1999, Inland was having problems with a corrugator, and they had employee issues. As a result, "lead time" on Inland's shipment of boxes to GFI went from five days to five weeks, and GFI was waiting for boxes, and running out of boxes. Goldberger testified that Inland representatives encouraged him to take some of GFI's business elsewhere in order that Inland could straighten out its problems. GFI brought certain of its box orders to Tenneco.

22. Then, sometime in November, Javorina and Nerison returned to GFI, and asked that the box business, which was going to Tenneco, be returned to Inland. Goldberger initially told them "no," but he then changed his mind because he liked the 3% Volume Discount. As a result, because Tenneco was manufacturing boxes cheaper than Inland had, Goldberger informed Inland that he would return that box business if Inland could meet Tenneco's price, and Inland agreed. After Inland informed GFI, however, that there were issues with the Volume Discount under the 1998 Agreement, any continued business relationship, between the two, was jeopardized. On December 1, 1999, Javorina and Nerison met with Goldberger, and addressed items on an agenda that was prepared by Inland. See, GFI Exhibit 61.

23. During the course of the discussions, Inland proposed new box pricings; a means of "clean[ing] up" GFI's boxes, which were being stored for over 90 days in Inland's warehouse; a proposed extension of the 1999 Agreement until June 30, 2001; and a proposal by which Inland would "honor rebate for 1999." Id. No accord was reached during the course of that meeting and, according to Nerison, Javorina had proposed the provision that "Inland [would] honor rebate for 1999," but without authority from Inland's management. As explained by Nerison,

Javorina wanted a sale, and he would then make a proposal to Inland's management. For his part, Goldberger stated that GFI would not do business with a company that did not keep its word -- namely, honoring the Volume Discount -- and GFI was unwilling to accept Inland's proposed increase in the price of boxes. In turn, Inland placed a "credit hold" on GFI because of the Volume Discount that GFI had unilaterally taken under the 1998 Agreement.

24. Following the meeting on December 1, the parties had additional discussions, but no agreement to continue their business relationship was reached. GFI proposed an amicable way of parting, which would allow GFI to obtain the tooling dies it needed for use by other box manufacturers, and also proposed a means to remove its box inventory from Inland's warehouse. An agreement on those terms was reached, as reduced to writing in a letter dated December 27, 1999, from Goldberger to Dan Blakley, which stated as follows:

> As we discussed, you may bill my company on or after December 31, 1999 for the current inventory of GFI and FBP boxes at your Shakopee warehouse. We will subsequently remove all current inventory from the warehouse, on or before January 31, 2000. Pending invoices will be paid within our normal terms. All GFI and FBP box printing plates will be released to a GFI

> representative at no cost, starting with the 20101, 2030, 50, 41 plates on December 27, 1999. As long as GFI meets it's [sic] commitments as stated about to Inland, Inland will release additional plates as needed, with any remaining plates being released on March 1, 2000.

Inland Exhibit 4; GFI Exhibit 63.

Both sides felt that the proposal of December 27, 1999, resulted in an agreement that would allow the parties to transition out of their business relationship. Inland released the referenced plates on December 27, 1999, and billed GFI for the current inventory of boxes in Inland's warehouse. See, GFI Exhibit 7.

25. As related by Goldberger, the parties made the decision that they would not be able to do business together, and they needed an amicable way of parting. Goldberger admits that the agreement of December 27 was typed by GFI, on GFI letterhead, but he testified that the language of the agreement was dictated by Inland. Inland did not want GFI's boxes in its warehouse, and GFI wanted the return of its dies in order that their new supplier, Liberty Carton, could use those dies, since GFI needed boxes. Goldberger acknowledged that GFI owed Inland a lot of money, and the agreement of December 27 was the means by which GFI would be able to "catch up" on "back due" boxes. The four

plates, which were referenced in the agreement, were the most frequently used in the manufacture of GFI's boxes.

26. The agreement of December 27 soon unraveled. The Record reflects that GFI did not "remove all current inventory from [Inland's] warehouse, on or before January 31, 2000," nor did it pay "pending invoices * * * within [GFI's] normal terms." In invoices dated January 10, 2000, Inland documented unpaid billings of $57,648.58. See, Inland Exhibit 7; GFI Exhibits 65, 66 and 67. Although there was some testimony that GFI, consistent with the agreement of December 27, 1999, removed some of its boxes which were warehoused by Inland, the draw of the back inventory of boxes appears to have ended on January 5, 2000. See, GFI Exhibit 64. Rather, in an inventory of GFI products, which Inland prepared on December 19, 2000 -- eleven months after the January 10 tabulation -- a total inventory of $57,648.56 in GFI's boxes was tallied as being in storage at Inland.[5] See, Inland Exhibit 5; GFI Exhibit 68. As a consequence, Inland refused to release the remaining GFI printing and cutting dies.

[5]We presume that the $0.02 discrepancy is a computational error by those taking the inventories.

27. The unraveling is enigmatic. According to Goldberger, GFI badly needed the boxes in Inland's warehouse and, in fact, the price of those boxes was less than GFI could purchase from its other supplier, Liberty. In turn, Nerison testified that the printing and cutting dies, which GFI wanted, were of no further use to Inland, as the dies were custom-made for GFI, and had no utility for any of Inland's other customers. Nonetheless, the proverbial "hackles" were up, and business judgment appears to have lapsed, on both sides.

28. During 2000, Inland leased three trailers, at $280.00 per trailer, for a total of twelve months, in order to store GFI's back inventory of boxes, for a total storage expense of $10,080.00. See, Inland Exhibit 17. According to GFI, even if it were liable for the storage costs, the reasonable monthly rental should not have exceeded $120.00 per month.

29. On April 28, 2000, GFI deducted, in a remittance to Inland, a total of $14,862.00 in expenses it was charged, by a third-party, in manufacturing printing plates, and cutting dies, to replace those that Inland refused to return. See, Inland Exhibit 69. For its part, Inland denies any responsibility for GFI's decision to purchase replacement plates and dies, and complains that, in March and September of 1999, GFI deducted a

total of $998.34, from its remittances to Inland, and never justified those deductions. See, Inland Exhibits 10 and 11. At Trial, Goldberger surmised that the deductions were due to deficiences in the quality of boxes shipped to GFI, but GFI never kept records which would explain the deductions made.

30. On June 21, 2000, Inland commenced suit against GFI in the State Courts of South Dakota, which resulted in a voluntary dismissal on December 21, 2001. See, Defendants' Trial Brief [Docket No. 24], at p. 11. During the pendency of that law suit, arrangements were attempted to allow the purchase the remaining boxes, which were being warehoused by Inland, for $57,648.58 but, apparently, the arrangements broke down after miscommunications between counsel for the parties. Goldberger testified that GFI was excited about the prospect of paying for those boxes, as the price of boxes had substantially increased, and obtaining those boxes, at that price, would have been a "good business decision," but he understood that Inland would not allow GFI to inspect the boxes before payment of the amount due. Nerison testified, however, that Inland had no problem with GFI inspecting the boxes before payment, but he understood that GFI was demanding to have the boxes shipped to GFI before

inspection, and Inland did not want to allow GFI to claim damaged goods, before the boxes left Inland's premises.

31. As a result of those miscommunications, after providing notice to GFI, Inland destroyed the boxes, apparently on February 2, 2001, in order to avoid the continuing expense of storage. GFI contends that, in destroying the boxes, Inland either made, or could have made a profit, in mitigation of its claimed damages, while Nerison testified, without contradiction, that the boxes were of good quality, but having been custom-tailored for GFI, they could not be sold to others, and their destruction was a "push" or a "wash."

32. On this Record, Inland claims the following damages owing to GFI's alleged breach of contract:

| | |
|---|---|
| A return of the "unearned Volume Sales Rebate ........................... | $ 38,336.10 |
| A return of the "unidentified deductions" ............................ | 998.34 |
| A return of the "improper tooling deductions" ............................ | 14,862.00 |
| Payment for the "unpaid product invoices" .............................. | 57,648.56 |
| Reimbursement of storage costs ......... | 10,080.00 |
| Total Damages | $121,925.00 |

On the same Record, GFI denies any liability to Inland, and alleges that Inland has failed to prove any damages attributable to GFI.

33. The attached Memorandum is expressly made a part of these Findings of Fact, insofar as the Memorandum contains factual findings.

## III. Conclusions of Law

1. The Court has jurisdiction over the subject matter of this action pursuant to Title 28 U.S.C. §1332(a), as the controversy involves citizens of different States, and the amount in dispute exceeds $75,000.00. The Court has personal jurisdiction over each of the parties.

2. Given our diversity of citizenship jurisdiction, we apply the substantive law of the State of Minnesota, where the agreements in question were negotiated, and executed. See, Adzick v. Unum Life Ins. Co., 351 F.3d 883, 886 n. 6 (8th Cir. 2003)("Federal jurisdiction in this case is based on diversity," and "[t]hus Minnesota's substantive law applies."), citing Larsen v. Mayo Medical Center, 218 F.3d 863, 866 (8th Cir. 2000).

3. Under Minnesota law, the determination of whether a contract is ambiguous is a question of law. Medtronic, Inc. v. U.S. Xpress, Inc., 341 F.3d 798, 800-01 (8th Cir. 2003). "A

contract is to be interpreted to give effect to the mutual intention of the parties at the time of contracting, and in so doing the language used governs if it is clear and does not involve an absurdity." Fox Sports Net North, LLC v. Minnesota Twins Partnership, 319 N.W.2d 329, 334 (8th Cir. 2003), quoting Carl Bolander & Sons, Inc. v. United Stockyards Corp., 298 Minn. 428, 215 N.W.2d 473, 476 Minn. 1974). "In interpreting a contract, the language is to be given its plain and ordinary meaning." Id. at 334, quoting Brook-field Trade Center v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998).

4. "If a contract's terms are ambiguous, the court will consider extrinsic evidence, and construction of the contract becomes a question of fact." In re Airline Ticket Commission Antitrust Litigation, 268 F.3d 619, 624 (8th Cir. 2001), quoting Barry v. Barry, 78 F.3d 375, 382 (8th Cir. 1996)(applying Minnesota law). "Ambiguity arises when the language is subject to more than one reasonable interpretation." Cousineau v. Norstan, Inc., 322 F.3d 493, 496 (8th Cir. 2003), citing Brookfield Trade Center v. County of Ramsey, supra at 394. "Divergent interpretations do not necessarily create ambiguity, especially when an interpretation contradicts the language of the contract." Boat Dealers' Alliance, Inc. v. Outboard Marine

Corp., 182 F.3d 619, 621 (8th Cir. 1999), citing Banbury v. Omnitrition Int'l, Inc., 533 N.W.2d 876, 880 (Minn.App. 1995).

5. "Ambiguities are resolved by ascertaining the intent of the parties from contract documents and relevant extrinsic evidence." In re Milk Products Antitrust Litigation, 195 F.3d 430, 435 (8th Cir. 1995), citing Republic Nat'l Life Ins. v. Lorraine Realty Corp., supra at 354. "Parol evidence may be considered 'to explain the circumstances surrounding the execution of the documents." Cousineau v. Norstan, Inc., supra at 497, quoting Poser v. Abel, 510 N.W.2d 224, 227 (Minn.App. 1994), quoting, in turn, Anderson v. Kammeier, 262 N.W.2d 366, 370 n. 2 (Minn. 1997)(contracts in several writings relating to the same transaction will be construed with reference to each other), and citing Doyle v. Wohlrabe, 243 Minn. 107, 66 N.W.2d 757, 762 (1954)(parol evidence explaining time, place, parties, and other circumstances may be received to aid in interpreting contract terms).

6. "The law is well-settled that a writing which does not purport to include all the terms of the agreement or which is shown to be incomplete by a mere inspection of its face, may be enlarged by parol or extrinsic evidence to show the entire agreement." Bunker v. Meshbesher, 147 F.3d 691, 697 (8th Cir.

1998), quoting Lenz v. Pearson, 246 Minn. 145, 74 N.W.2d 662, 666 (1956); See, also, Material Movers, Inc. v. Hill, 316 N.W.2d 13, 17 (Minn. 1982) ("[W]here a written agreement is ambiguous or incomplete, evidence of oral agreements tending to establish the intent of the parties is admissible."). Here, the agreements in question were not fully integrated and, on their face, they were not the product of persons trained in the law. The agreements represent a shorthand rendition of the parties' negotiations, leaving the details to the parties' collective recollection. To use but one example, the 1997 Agreement allowed a 1% discount if payment were made within 10 days of an invoice, but that meaning is not derived from the face of the Agreement.

7. With respect to the provisions at issue, the parties offer divergent, but quite plausible constructions of the contractual language they employed. As Inland urges, the Volume Discount provision, in each of the agreements, expressly refers to "end of agreement," and "paid invoices." Further, the agreements define the term of the agreement with specific beginning and ending dates. An inference, that the parties intended to allow a Volume Discount, only if actual paid invoices, as of the ending date of the agreement in question,

would be reasonable. GFI, however, proffers an equally reasonable construction, for Inland made plain its willingness to allow interest-free credit for varying periods of time. Indeed, the 1997 Agreement plainly evinces Inland's interest in having prompt payment, by offering a 1% discount if an invoice were paid within 10 days –- an inducement not present in the succeeding agreements.

8. We conclude that, upon a fair reading, the Volume Discount provisions are ambiguous, and therefore, the meaning of those provisions raise an issue of fact. For reasons we later detail, we conclude that GFI's construction of those provisions is the correct one.

9. Similarly, we conclude, as a matter of law, that the provisions of the agreements which pertain to tooling, and dies, are ambiguous, and we further conclude, for reasons we shall detail, that GFI's interpretation of those provisions is the only construction sustainable on this Record.

10. Accordingly, we conclude that the deductions that GFI took for the Volume Discount, under the 1998 Agreement, were lawful, as were the deductions taken for the expense GFI incurred in replicating tools and dies that Inland improperly withheld from GFI in 2000.

11. The other deductions, however, that GFI took, and which are not explained, and certainly not justified on this Record, were improper, and are disallowed.

12. Lastly, we conclude that GFI is responsible for the cost of the boxes warehoused by Inland during 2000, both the original cost of the boxes, and the costs incident to their storage.

13. In sum, GFI is obligated to pay Inland the sum of $68,726.90.

14. The attached Memorandum is expressly made a part of these Conclusions of Law, insofar as the Memorandum contains legal conclusions.

## IV. Order

That, given the foregoing Findings of Fact and Conclusions of Law, the Court directs that Judgment be entered in favor of Inland in the amount of $68,726.90.

BY THE COURT:

s/ Raymond L. Erickson
Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

M E M O R A N D U M

A. Standard of Review. "Contract interpretation is determined as a matter of law," "unless the contract terms are ambiguous." Cousineau v. Norstan, Inc., supra at 496, citing Lake Superior Paper Indus. V. Minnesota, 624 N.W.2d 254, 258 (Minn. 2001), and Brookfield Trade Center v. County of Ramsey 584 N.W.2d 390,, 394 (Minn. 1998). Where, as here, the contract at issue is not "fully integrated," the Court may rely upon parol evidence in order to establish the intent of the parties. Bunker v. Meshbesher, supra at 697, citing Material Movers, Inc. V. Hill, 316 N.W.2d 13, 17 (Minn. 1982)(holding that, "where a written agreement is ambigu-ous or incomplete, evidence of oral agreements tending to establish the intent of the parties is admissible."). Simply stated, "'[t]he law is well-settled that a writing which does not purport to include all the terms of the agreement or which is shown to be incomplete by a mere inspection of its face, may be enlarged by parol or extrinsic evidence to show the entire agreement.'" Bunker v. Meshbesher, supra at 697, quoting Lenz v. Pearson, 246 Minn. 145, 74 N.W.2d 662, 666 (1956). We find that the provisions of the contract, which relate to the Volume Discount, are ambiguous as a matter

of law, since those provisions are susceptible to “more than one reasonable construction.” Fox Sports Net North, LLC v. Minnesota Twins Partnership, supra at 334, citing Blattner v. Forster, 322 N.W.2d 319, 321 (Minn. 1982).

In considering the evidence of Record, as it relates to the Volume Discount, we are persuaded that the testimony of Goldberger is credible as it relates to the intent of the parties in drafting a Volume Discount. We do not suggest that Nerison was guilty of falsehoods, but the simple fact is that he was not a direct participant in the negotiations which led to any other than the 1999 Agreement and, even then, his precise role is not fully disclosed by this Record. Goldberger negotiated the 1997 Agreement with Gareri, and with Blakley, and that agreement served as the model for those which followed. Goldberger testified, we find believably, that the parties intended the Volume Discount to apply to invoices which were ordered prior to the close of the contract period, so long as they were paid within the time allowed for credit payments.

Other interpretations could be reasonable, on the face of the 1997, and the subsequent Agreements, but those interpretations are not sustainable by the Record as a whole. First, we note that Gareri, although not recalling the precise

details of the negotiations which led to the 1997 Agreement, was aware that Inland had employed Volume Discounts with customers other than GFI. No such policies, or practices, appear in this Record and, if Inland had a standard policy for Volume Discounts, which would counter Goldberger's expression of the parties' intent, we would have expected that evidence to have been presented.

Moreover, Goldberger's interest in obtaining favorable credit terms for GFI was plainly evident, so much so that he impressed upon Inland, successfully, that the 1998 Agreement had to be modified in order to memorialize that a payment, within 60 days of an invoice, would be treated as a payment in cash. Nothing is offered to demonstrate that the credit terms of the agreements were not an integral part of the Volume Discount, other than Inland's construction of the ambiguous language of the agreements, themselves. Indeed, when the parties effectuated their intent, in 1998, by the payment of a Volume Discount under the 1997 Agreement, they implemented the contractual intent expressed by Goldberger. We understand Inland to assert that we should place no weight on that payment of a Volume Discount because it was corporate error, and not an effectuation of contractual intent.

We are not so persuaded. While GFI urges that the initial payment of the Volume Discount established a "course of dealing," under Minnesota law, we are not persuaded that the fact of the first payment bears such weight. Had Inland timely advised GFI that the payment was a mistake, our analysis would be starkly different, but Inland never informed GFI, notwithstanding the negotiation of two succeeding agreements, that the initial Volume Discount was a simple mistake. We find no credible evidence to support the contention that the payment of a Volume Discount was error but, even if we did, that would simply explain Inland's silence during the negotiations, with GFI, which led to the 1998 Agreement, since that agreement was executed before the Volume Discount had been paid. Inland offers **no** explanation for failing to disclose such a materially different construction of their agreements with GFI, and no bona fide, good faith reason, comes to mind, with respect to the negotiation of the 1999 Agreement, which occurred after Inland in-ternally circulated a memorandum expressing a different interpretation of the Volume Discount than that which prompted the payment of that discount to GFI.

The subsequent actions of the parties are most probative of their contractual intent. See, Cousineau v. Norstan, Inc.,

supra at 497, citing Fredich v. Independent Sch. Dist. No. 720, 465 N.W.2d 692, 695-96 (Minn.App. 1991), as "holding the most probative evidence of intent is the subsequent action of the parties to the contract." We can fathom no legitimate reason for Inland to conceal its intention not to grant a Volume Discount to GFI, under the 1998 Agreement, when Inland was negotiating the terms of the 1999 Agreement with GFI. If, as Inland now portends, it honestly held the belief, that a Volume Discount had mistakenly been paid under the 1997 Agreement, we are confident that any responsible corporation would have disclosed that error, particularly when negotiating the acceptance of the very same terms, rather than to mislead the other contracting party into the false belief that the Volume Discount had been properly paid. On this Record, we are convinced that tensions existed between the local Inland employees and "Inland Corporate," and GFI, unfortunately, was caught in the crossfire.

Further, we find credible Goldberger's testimony that Inland officials authorized the rebate that GFI took under the 1998 Agreement. We are mindful that Nerison denied any such authorization but, given this Record, and the demeanor of the conflicting witnesses, we are persuaded that Goldberger is the

more believable. We can afford little credence to a corporate officer who would negotiate a contract, which contained a provision that, to him, was known to contain a materially divergent meaning to the other contracting party, and yet not disclose that divergence in the contract negotiation. Such conduct does not instill believability. As a result, we find that GFI was entitled to a rebate, in the form of a Volume Discount, under the 1998 Agreement, and Inland has no lawful entitlement to a return of that rebate.

We also find that GFI properly took rebates for the costs of replicating printing and cutting dies, in order to replace those that Inland refused to return. According to the credible evidence presented, GFI was paying an increased cost for Inland's bags, in order to cover the cost of the printing and cutting dies, until such time as those costs were paid in full. Inland offers no reason, and none comes to mind, why Inland should retain ownership, after the contract period, for tools and dies that were wholly paid for by GFI. The Record does not disclose any occasion when, at the close of the contract period, Inland had to bill GFI for tool and die costs that had not been fully recovered. Accordingly, we construe the provisions of the agreements, starting in 1998, to be consistent with the parties'

contractual intent, as evinced by the testimony of Gareri, and Goldberger, that GFI would own the "tooling," which was employed in the manufacture of its boxes, after the tooling costs were paid by GFI. We reasonably infer that, as a shorthand expression, the parties intended that Inland would "purchase and own all tooling used during the contract period," but that the ownership of the tooling, after the contract period, rested in GFI, so long as GFI had fully paid Inland, in advance, for the costs of obtaining, and maintaining or replacing, the tooling. On this Record, we have no showing that GFI ever failed to fully pay, in advance, the costs attendant to the printing and cutting dies. Therefore, GFI was entitled to a return of its tools and dies, and replacing that tooling, was an appropriate deduction from the amounts GFI otherwise owed to Inland.

After this point, we find little merit in GFI's refusal to pay Inland for the remaining costs Inland demands. As to those deductions, which GFI is unable to substantiate, we are not persuaded that a legitimate basis exists to excuse payment. We are confident that, if such a basis existed, then GFI would have recorded that legitimacy in some writing. Accordingly, on this Record, the unexplained deductions, which GFI unilaterally took, are not warranted, and those funds are owing to Inland.

Similarly, we find no basis for GFI's refusal to pay for those boxes that it had ordered from Inland. The boxes were not amenable to use by others, and GFI offers nothing, in competent evidence, to demonstrate that the boxes had any value, for mitigation of damages purposes, which could be realized. While GFI disbelieves Inland's assertion, that the destruction of the boxes was a "wash" or a "push," it offers no evidence which cogently undermines Inland's proof. Accordingly, we credit Inland's proof on this issue.

Further, we are satisfied that GFI owes Inland for the costs of storing the boxes, which were manufactured solely for GFI's use. Not unexpectedly, GFI contends that the costs were overstated, but we are not persuaded that one who chooses not to honor its contract with another, can complain that the costs in question could have been reduced by that party's resort to prices that might have been charged by a wholly-owned subsidiary. The fact of the matter is that, if GFI wanted to store the boxes in question, it was at liberty to do so, after paying the contract price. Here, GFI refused the boxes, and made no effort to warehouse them. Therefore, its assessment, that the price to warehouse the boxes was higher than GFI would have incurred, by using the services of a wholly-owned

subsidiary, is unconvincing, and we deny that aspect of GFI's request for relief.

As to the cost of warehousing, we are mindful that the contracts, which were negotiated by the parties, did not contemplate that GFI would pay for warehousing expenses. Nonetheless, the parties intended, and this is not in dispute, that Inland would warehouse GFI's boxes for a modest period of time, during which GFI would draw on that inventory. Here, however, we face a lengthy period of time, during which GFI refused to accept delivery of Inland's boxes that were specially manufactured for GFI. Ironically, GFI argues that, in destroying the boxes, Inland failed to migitage its contractual damages, while, at the same time, arguing that it was not responsible for any attendant warehousing costs. We find these assertions mutually inconsistent. Under Minnesota law, the appropriate measure of damages for a breach of contract is the amount that will place the plaintiff in the same position as if the contract had been performed. See, Logan v. Norwest Bank Minnesota, N.A., 603 N.W.2d 659, 663 (Minn.App. 1999). Consequential or foreseeable damages are also recoverable in contract. Lesmeister v. Dilly, 330 N.W.2d 95, 103 (Minn. 1983).

We find, and conclude, that GFI is responsible for both the payment of the box orders it did not previously honor, as well as the costs of warehousing those boxes while GFI considered whether to honor its purchase orders. Of course, we recognize the argument, that the parties reached an accord in the nature of a novation, as a result of the December 27th agreement, but we find no evidence to support such a contention. We find, on the evidence presented, that neither party has so much as suggested, let alone proven, that the agreement of December 27 was intended to supplant any earlier agreements. Albany Roller Mills, Inc. v. Northern United Feeds & Seeds, Inc., 397 N.W.2d 430, 433 (Minn.App. 1986) (For a novation to occur a valid contract must exist; all parties must agree to a new contract; the new contract must extinguish the old; and the new contract must be valid). No such showings have been made here, and we conclude that no novation occurred.

GFI agreed to pay for the boxes, that were manufactured by Inland for GFI's use, and we are presented with no basis to conclude that GFI should not be required to adhere to its agreement. As a consequence, we find and conclude that GFI must pay for its purchase of unique boxes from Inland, together with the attendant warehousing expenses, for a total amount of

$68,726.90. The fact that GFI could have saved money by electing to pay for the boxes on a timely basis, does not counsel a different result. The fact that GFI refused to pay for the boxes, that it had ordered from Inland, is sustainable on no recognizable, legal grounds.

R.L.E.